A. WILMOT DALFERES, Judge ad hoc
(dissenting).
Plaintiff entered into a contract of insurance with defendants to protect itself against certain unusual expenses incurred as a result of the hazards of its business. Specifically, the policy provided that plaintiff should recover expenses incurred in regaining control of an oil and gas well which it was in the process of drilling, when such expenses were resulting from: “Blowout and/or Cratering.”
*389 The Court observes that the term “blowout,” the pertinent provision in the instant case, is referred to in the same category as fire — lightening—tornado—cyclone —windstorm'—hurricane—hail—and some nine other hazards of the business. It would appear, therefore, that each of the hazards against which the insurance was insured v/as of such common acceptation in its scope that no specific definition was required.
Plaintiff, in proceeding with the drilling of an oil well in St. Landry Parish, encountered conditions which entailed additional expenses from its normal operations, and upon making claim to its insurer, was denied recovery on the grounds that the said well was not out of control and in the alternative, that if the well was out of control, necessitating additional expenses, that the said lack of control was not occasioned by a blowout.
After a lengthy trial judgment was rendered in favor of plaintiff. The trial Court found that “This well did blow out,” and analyzed the elements of damage alleged by plaintiff under the testimony adduced at the trial. The evidence adduced in behalf of plaintiff consisted of lay and expert testimony from witnesses who actually observed the situation during the period plaintiff contends the well was out of control. Two experts were offered by defendants who, on the basis of hypothetical questions propounded to them by counsel for defendants, testified that under the premises presented to them in the hypothetical questions that no blowout occurred, nor was the well out of control.
The majority opinion, in reversing the findings of the trial judge, cites as authority for their position the cases of Central Manufacturers’ Mut. Ins. Co. v. Elliott et al., 177 F.2d 1011 (1949), and Equity Oil Company v. National Fire Insurance Company of Hartford, 247 F.2d 393 (1957), both cases of the Tenth Circuit, United States Court of Appeal.
I am unable to concur in the majority opinion for the following reasons:
The definition of the term “blowout” contained in the Elliott case (supra) is as follows:
“The term 'blowout’ as used in oil operations has a technical meaning. It is generally defined as a condition in which a well builds up a sufficient gas pressure at the bottom of the hole and causes a rather sudden, forceful eruption or explosion which cleans out the well and causes it to go out of control.” (Emphasis ours.)
This definition has been modified by several subsequent decisions of the very Court that offered this original definition, so that the term now as defined by this Tenth Circuit Court of Appeal more nearly conforms to the facts in the instant case than to the Elliott case decided fourteen years ago. Anderson-Prichard Oil Corporation v. Parker Drilling Co., 245 F.2d 831, and Equity Oil Company v. National Fire Insurance Company of Hartford, 247 F.2d 393.
After defining the term “blowout” in the Elliott case the Court in footnote No. 3 cites Green v. General Petroleum Corporation, 205 Cal. 328, 270 P. 952, 60 A.L.R. 475, and Watkins v. Gulf Refining Company, 206 La. 942, 20 So.2d 273. While it is noted that these cited decisions are not decisive of the issues involved in the Elliott case, “they do contain a good description of what conditions constitute a blowout.”
In the Green case (supra), cited in the footnote, the well erupted, blowing off the control valve and wrecking the derrick. A stream of oil, gas, mud, and rocks shot into the air and onto respondents’ property which was located about two hundred feet from the well. This mixture continued to pour forth from the well for more than twenty-four hours, covering respondents’ property with the deposit to a depth of from four to seven inches, destroying the trees, lawns, and gardens, and greatly dam *390 aging respondents’ dwelling. In the Watkins case (supra), a Louisiana Supreme Court decision, an oil well was out of control from July 20, 1941, until August 13, 1941 The well caught fire approximately twenty-four hours after it blew out and while it was out of control, it expelled and emitted large quantities of gas, sand, salt water, distillate, and other substances damaging the crops, buildings, farm equipment, machinery and so forth of the plaintiff farmer. This blowout necessitated the employment of Kinley, an expert in combating wild wells. In spite of Mr. Kin-ley’s efforts which began on July 20, 1941, the well continued blowing as a wild well until August 13, 1941, when as a result of the cratering it bridged over and killed itself.
We have cited the factual situations in the two cases shown in the footnote to the Elliott decision for the reason that Court considered these cases as “containing] a good description of what conditions constitute a blowout.” While the facts in the Elliott case are not recited and the trial judge’s reasons are not reported in the Federal Supplement, we must conclude that the facts in the Elliott case did not conform to the facts in the Green or Watkins cases and for that reason the court held there was no blowout.
In the Anderson-Prichard case, 1957 (supra), which also resolved the issues by a definition of the term “blowout,” gas was unexpectedly encountered in a structure at about 8,350 feet. The bottom hole gas pressure overcame the hydrostatic weight of the column of drilling mud in the well, and gas began to rise toward the surface, forcing the drilling mud out of the top of the well. It became necessary to activate the blowout prevention mechanism and close the hole. After the well was brought under control, drilling was resumed and the well completed as a producer. The Court said:
“A ‘blowout’, as used in the oil industry, is generally defined as a condition in which a well builds up sufficient gas pressure at the bottom of the hole to overcome the hydrostatic weight in the well, and forces its way to the ground surface.”
Certainly, therefore, under the factual recitation in the Anderson-Prichard case every element and condition found in the Green and Watkins cases are not sacramental requirements in defining the term “blowout,” as many elements found in the Elliott definition and in the Green and Watkins cases are not found in the Anderson-Prichard case. In spite of that, the Court found that a blowout had occurred in the Anderson-Prichard case.
In the instant case the evidence shows that on July the 20th at 1:00 P.M. mud was returning to the pit in greater quantities than was injected in the well, and that mud was flowing on the rotary floor. Certainly this indicated that the well had built sufficient gas pressure at the bottom of the hole to overcome the hydrostatic weight in the well, and was forcing its way to the ground surface and was out of control as defined in the Anderson-Prichard case.
Following the Anderson-Prichard case (Tenth United States Circuit Court of Appeal, 1957), this same Court was presented with the factual situation in the Equity case, in which the court held that a blowout had occurred. The facts in the Equity case, like in the Anderson-Prichard case, differed materially from the facts in the Green and Watkins cases. It is interesting to note that while the Anderson-Prich-ard case modified the Elliott case definition in many regards and particularly with reference to the cleaning out of the well, Judge Huxman, who was the organ of the Court in the Elliott case, did not dissent. However, in the Equity case wherein Judge Huxman was again on the panel, he strongly believed that the definition of “blowout” was so radically modified that he found it necessary to write a dissenting opinion. This Equity case, the last of record, is one *391 which the Majority herein cites with approval. Judge Huxman at page 396 of 247 F.2d stated:
“The burden rested upon the insurance company to establish by convincing evidence not only that a blozvout, as defined by us in the Elliott case, occurred * * * and that but for such blowout no fire would have occurred. I search [ed] the record in vain to find any facts supporting or tending to support a finding that a sudden, forceful, violent, rending, or eruptive force took place at the bottom of the hole at any time, let alone preceding the fire. (Emphasis ours.)
Judge Huxman’s dissenting opinion continued :
“From this evidence it appears that no noticeable incident occurred preceding the fire. In fact, nothing had occurred which indicated turbulence or disturbance in the hole. The tools did not come out of the hole * * * The casing was not bent or twisted in any way. All the property at the well remained the same as before, save for the damage that was done by the fire and, aside from the short time the fire burned, the well and its equipment was in the same condition as before.”
Clearly, therefore, the Tenth Circuit Court radically modified the definition of a blowout as stated in the Elliott case, and the Equity case is the prevailing jurisprudence in the Tenth Circuit Court of Appeal today.
In the Georgia Home Insurance v. Means, 186 F.2d 783, (Fifth Circuit, 1951), plaintiff obtained a policy, the pertinent terms of which provided:
“The term ‘Blowout’ shall be defined as a sudden expulsion of drilling fluid (mud, water and sometimes oil) followed by an uncontrolled flow of oil, gas, or water from an uncompleted well that occurs when the pressure of oil, gas or water entering the hole at some depth is greater than the pressure exerted by a column of drilling fluid in the well.”
The Court found from the undisputed evidence that,
"There was a sudden expulsion of drilling fluid followed by an uncontrolled flow of oil, gas and water, in that the pressure of the gas entering the hole was, and, despite all efforts to prevent it, continued to be, greater than the pressure exerted by the heavy column of drilling fltiid forced down into the well. It was this differential in the gas pressure which, causing the blowout, in turn, caused the bridging over of the well and the loss to plaintiff.” (Emphasis ours.)
In the Dyer case,[1] the policy defined “blowout” as follows:
“The term ‘blowout’ shall be defined as a sudden expulsion of drilling fluid not excluded otherwise by this policy, followed by an uncontrolled flow of oil, gas or water from the well that occurs when the pressure entering the well at some depth below the surface is greater than the pressure exerted by the column of drilling fluid in the well, resulting-in the complete lack of control of the well or drilling operation. * * *
“It is understood and agreed that a ‘kick’ as commonly referred to in the drilling of a well which may result in a drillstem being stuck shall not be deemed a blowout unless such ‘kick’ is immediately followed by a blowout as above described.”
Our learned brothers, in the majority opinion, acknowledge that there is no well-accepted definition of the word “blowout” in the petroleum industry. With this, I am in full accord. The policy in the instant case, unlike the policies in the Means and *392 Dyer cases (supra), does not define the term “blowout.” The majority opinion, admitting the ambiguity of the term “blowout,” does not in its application to the factual situation in the instant case construe the term most favorable to the insured. Albritton v. Fireman’s Fund Ins. Co., 224 La. 522, 70 So.2d 111. In the Albritton case (supra), the Court was called upon to apply the term “collision” as related to an insurance policy. Our Supreme Court said,
“Our law, therefore, conformable with the universal rule applicable to contracts of insurance, is that all ambiguities must be construed in favor of the insured and against the insurer.” (Numerous citations.)
While the majority opinion seeks to clarify the uncertainty of this situation in insurance policies by a reversal in the instant case, we think that the effect would be to encourage litigation in every instance where the simple term “blowout” is contained in a policy. To affirm the trial Court’s opinion would, in effect, compel future insurance policies to contain a clear and concise description of the term “blowout,” so that the insured and the insurer would have a firm foundation upon which to determine the extent of their rights and obligations.
The trial judge was privileged to hear and evaluate the testimony of the witnesses, lay and expert. He was conversant with the factual situation as recited by the eye witnesses; he was able to determine the accuracy of the hypothetical questions propounded to the experts called by defendants,[2] and evaluating their testimony and giving each factual matter its due weight, concluded that there was a blowout. From a thorough reading of the evidence, I am unable to find any manifest error in the holding of the trial Court on the question of fact. Schutzman v. Munson, La.App., 51 So.2d 125.
Having found no rational basis for reversing the trier, I must respectfully dissent.

. Fidelity-Phenix Fire Insurance Co. of N. Y. v. Dyer, 5 Cir., 220 F.2d 697.

. Keener v. Fidelity and Casualty Co. of New York, La.App., 96 So.2d 509, at 515: “It is a cardinal rule that for an expert opinion to be of value the reality of the state of facts upon which such an opinion is predicated must be shown to exist. An opinion based on assumed facts, varying materially from the actual facts, is without probative value and is insufficient to sustain a judgment.” (Emphasis ours.)
"Wigmore on Evidence, Third Edition, Sections 608 et seq.